IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| JAMES S. THOMPSON | ) | |
|---|---|---|
| | ) | Civil Action No. 9-1416 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lenihan |
| | ) | |
| NORMAN HOWARD, a Redstone | ) | |
| Township Policeman | ) | |
| | ) | ECF No. 123 |
| Defendant. | ) | |

## MEMORANDUM OPINION

**Lenihan, M.J.**

Presently before the Court is the Motion for Summary Judgment filed by Defendant Norman Howard. (ECF No. 123.) For the reasons discussed below, the Motion will be granted.

I. FACTS

The following facts are undisputed unless otherwise indicated and are taken from the parties' Statements of Undisputed Material Facts and Responses thereto at ECF Nos. 125, 129, and 135, as well as other relevant portions of the summary judgment record.

On March 9, 2008, Plaintiff James S. Thompson ("Plaintiff") was a passenger in a 1999 Chevrolet Malibu being driven by his then-girlfriend, Rae Lynn Sigwalt ("Sigwalt"). (ECF Nos. 125, 129 at ¶ 1.) As Sigwalt and Plaintiff were travelling on Route 166 in the area of Republic, PA, Plaintiff observed a Redstone Township police car sitting in the parking lot of Buzzy's gas station on Route 166. (ECF Nos. 125, 129 at ¶ 2.) After Sigwalt drove past Buzzy's, the Redstone Township police car began following the Malibu. (ECF Nos. 125, 129 at ¶ 3.) At the

time, Defendant Norman Howard ("Defendant") was a police officer employed by Redstone Township, and was on duty for the 6:00 p.m. to 2:00 a.m. shift. He was wearing his police uniform and driving a marked police vehicle. (ECF Nos. 125, 129 at ¶ 4.) Defendant was also employed by the Fayette County Court as a constable. (ECF Nos. 125, 129 at ¶ 5.)

Defendant testified that between 7:00 and 7:30 p.m. on March 9, 2008, Defendant was patrolling on southbound Route 166 in Republic, PA when he observed a Malibu, driven by a female, traveling northbound on Route 166. (ECF Nos. 125, 129 at ¶ 6.) Defendant testified that he recognized the female driver as Sigwalt, whom he had previously transported between the prison and the courthouse in his work as a constable. (ECF Nos. 125, 129 at ¶ 7.) Defendant further testified that through his work as a constable, in which he had recently assisted in a warrant sweep, he was aware that a bench warrant existed for Sigwalt's arrest. (ECF Nos. 125, 129 at ¶ 8.) Defendant began following the Malibu, and when Sigwalt made a turn without using a turn signal, he initiated a traffic stop on Rollie Street in Republic. (ECF Nos. 125, 129 at ¶ 9.)

Defendant parked his police car behind the Malibu. (ECF Nos. 125, 129 at ¶ 10.) He contacted dispatch with the license plate number of the vehicle, and dispatch responded that the vehicle was registered to a Michelle Rausch and a James Erjavec. (ECF Nos. 125, 129 at ¶ 11.) Defendant approached the driver's side of the Malibu and asked Sigwalt for her driver's license, registration, and insurance. (ECF Nos. 125, 129 at ¶ 12.) Sigwalt handed Defendant her driver's license, and Defendant returned to the police car. (ECF Nos. 125, 129 at ¶ 13.) Defendant testified that he contacted county dispatch and confirmed that the warrant for Sigwalt was still in effect. (ECF Nos. 125, 129 at ¶ 14.) Defendant then returned to the Malibu and asked Sigwalt to step out of the car. (ECF Nos. 125, 129 at ¶ 15.) Plaintiff inquired as to the reason for the traffic stop, and according to Plaintiff, Defendant told him to "shut up." (ECF Nos. 125, 129 at ¶ 16.)

Defendant handcuffed Sigwalt and put her in the police car. (ECF Nos. 125, 129 at ¶ 17.) Defendant states that at this point, he observed Plaintiff repeatedly turning his head and moving about, and that Plaintiff appeared to be making reaching movements. (ECF Nos. 125, 129 at ¶ 18.)[1] Defendant then approached the passenger side of the vehicle. Defendant noticed that Plaintiff's head disappeared from view for a second or two as Defendant approached, and Defendant could not see Plaintiff's hands as he approached. (ECF Nos. 125, 129 at ¶¶ 19-20.)[2]

Defendant was not familiar with Plaintiff prior to the events in issue.[3] (ECF Nos. 125, 129 at ¶ 21.) When Defendant reached the passenger side of the vehicle, he could see that Plaintiff's hands were down below the seat. (ECF Nos. 125, 129 at ¶ 24.)[4] Defendant asked Plaintiff for his identification, and directed him to step out of the car and walk to the rear of the Malibu. Plaintiff complied. (ECF Nos. 125, 129 at ¶ 25.) Defendant told Plaintiff to put his hands on the trunk. Again, Plaintiff complied, and Defendant performed a patdown of Plaintiff's person. (ECF Nos. 125, 129 at ¶ 26.) Defendant uncovered no weapons. (ECF Nos. 125, 129 at ¶ 27.) Plaintiff provided Defendant with his name, and Defendant obtained Plaintiff's social security card and an "*ACCESS*" card from a pocket in Plaintiff's jacket during the patdown. (ECF Nos. 125, 129 at ¶ 28.)

As Plaintiff was standing outside the Malibu, Defendant ran Plaintiff's name through county dispatch on his portable radio while standing near the rear driver's side of the Malibu. (ECF Nos. 125, 129 at ¶ 29.) After Defendant provided Plaintiff's identification to dispatch, a

---

[1] Although Plaintiff disputes these assertions in his Response to Defendant's Concise Statement of Material Facts, Plaintiff's citations to the record do not provide support for Plaintiff's contention that these facts are disputed.
[2] Although Plaintiff disputes these assertions in his Response to Defendant's Concise Statement of Material Facts, Plaintiff's citations to the record do not provide support for Plaintiff's contention that these facts are disputed.
[3] Plaintiff attempts to dispute this fact in his Response to Defendant's Concise Statement of Material Facts, but Plaintiff's citation to the record only reveals that Defendant thought he may have seen Plaintiff once, but Plaintiff stated to Defendant, when questioned by him, that he was not the man Defendant saw.
[4] Although Plaintiff disputes these assertions in his Response to Defendant's Concise Statement of Material Facts, Plaintiff's citations to the record do not provide support for Plaintiff's contention that these facts are disputed.

3

transmission came over his radio from a voice that Plaintiff recognized as Roy Mehalik, the Police Chief of Luzerne Township ("Chief Mehalik"). Plaintiff asserts that when both of them were children, he suffered abuse at the hands of Chief Mehalik. (ECF Nos. 125, 129 at ¶ 30 and Plaintiff's Dep., ECF No. 126-1 at 31-32.)

Redstone and Luzerne Township share a police radio channel. During this time, Chief Mehalik was employed by the Luzerne Township Police Department and was working the 2:00 p.m. to 10:00 p.m. shift. (ECF Nos. 125, 129 at ¶¶ 31-32.) Chief Mehalik heard Defendant's radio transmission to 911 regarding the subject traffic stop, and his subsequent transmission asking dispatch to "run James Thompson." (ECF Nos. 125, 129 at ¶ 33.) Upon hearing Defendant transmit Plaintiff's name, Chief Mehalik stated the following: "I am on my way down there[,] you might want to use some caution with that individual[.]" Defendant responded to Chief Mehalik as follows: "10-4[.] That's what I figured[.]" (Transcribed March 9, 2008 audio transmissions from the Pennsylvania State Police, ECF No. 130-5 at 2.) The audio transmission also confirmed that there were no outstanding warrants for Plaintiff. (*Id*. at 3.)

Defendant contends that by this time he was becoming concerned for his safety, while Plaintiff contends that he had no reason to be concerned because Defendant knew that Plaintiff had no outstanding warrants.[5] (ECF Nos. 125, 129 at ¶¶ 19, 20, 21, 23, and ECF No. 130-5 at 2.) Defendant asserts he did not release Plaintiff immediately after confirming the lack of warrants, because he was still investigating other aspects of the stop which resulted in Sigwalt's arrest, including a search of the vehicle. (ECF No. 125 at ¶ 44.) Plaintiff disputes that this was Defendant's reasoning because Defendant never indicated that he wanted to search the vehicle or that this was a precondition to releasing Plaintiff. (ECF No. 129 at ¶ 44.) Instead, Defendant

---

[5] Plaintiff states that Defendant had told him that if he did not have any outstanding warrants he would be free to go. (ECF No. 129 at ¶ 38.)

told Plaintiff that he was going to place him in handcuffs. The parties agree that Plaintiff refused to go into cuffs, and that Plaintiff repeatedly insisted that there was no reason that he should be placed into cuffs. (ECF Nos. 125, 129 at ¶ 45; Plaintiff's Dep., ECF No. 126-1 at 56-58.) Plaintiff states that Defendant used racial epithets and threatened to taser and kill Plaintiff if he did not comply. (ECF Nos. 125, 129 at ¶ 39.) Plaintiff further states that, at this time, he became terrified in response to Defendant's conduct, and by the fact that his childhood menace, Chief Mehalik, was on his way to the scene. (ECF No. 129 at ¶¶ 38-30, Plaintiff's Dep., ECF No. 126-1 at 64.) Defendant states that, while still at the back of the Malibu, Plaintiff appeared to be "going for that passenger's side of the car for some reason" and he became concerned that there may be a weapon inside the car. Plaintiff disputes that he was going for the passenger's side of the car, but Plaintiff's citation to the record does not support his assertion. (ECF No. 129 at ¶ 40 (Plaintiff's Dep. at 51:22-25 ("Q: At any point before Officer Howard talked about cuffing you, did you ever ask to go back into car to get another cigarette? A. No.").) In fact, Plaintiff admits that when Defendant began insisting that he go into handcuffs, Plaintiff started backing up toward the passenger side of the car. (Plaintiff's Dep., ECF No. 126-1 at 59.)

After Plaintiff's repeated refusals to go into handcuffs, Defendant deployed his taser in the area of Plaintiff's torso. (ECF Nos. 125, 129 at ¶ 54.) Defendant twice attempted to taser Plaintiff, but neither attempt had any effect on Plaintiff. (ECF No. 125 at ¶ 56).[6] During one of the attempts, Defendant shocked himself with the taser. (ECF Nos. 125, 129 at ¶ 57.) Thereafter, according to Plaintiff, Defendant yelled racial epithets and threats to Plaintiff that he would kill him. Plaintiff then hurried to the front of the Malibu. (ECF Nos. 125, 129 at ¶ 59.)

---

[6] Plaintiff relies upon his deposition testimony in an attempt to create a disputed issue of material fact as to whether the taser had any effect on him. In his Complaint and Amended Complaint, Plaintiff states unequivocally that the taser failed to work both times. As will be discussed, *infra* at section III, Plaintiff is estopped from contradicting his own prior sworn statements, absent a plausible explanation for the contradiction, which appears at no point in the record.

5

While Defendant thought Plaintiff was attempting to flee, Plaintiff asserts that he was terrified of Defendant and was trying to get away from him. (ECF Nos. 125, 129 at ¶ 60.) Using racial epithets (according to Plaintiff), Defendant commanded Plaintiff to stop and get on the ground. (ECF Nos. 125, 129 at ¶ 61.) The parties agree that Defendant chased Plaintiff, striking him with his baton, as Plaintiff proceeded around the car. (ECF Nos. 125, 129 at ¶ 63.) According to Plaintiff, he was limping as Defendant struck him.[7] (ECF No. 129 at ¶ 65.)

On the second or third time around the Malibu, Plaintiff jumped into the driver's seat, locked the door and started the engine.[8] (ECF Nos. 125, 129 at ¶ 65; Plaintiff's Dep., ECF No. 126-1 at 65.) Plaintiff was leaning towards the passenger side of the vehicle after Plaintiff jumped into the driver's seat.[9] (ECF Nos. 125, 129 at ¶ 69.) At this time, Defendant states he could not see Plaintiff's hands. (ECF Nos. 125, 129 at ¶ 71.)[10] Defendant used his baton to break the glass of the driver's window and to strike Plaintiff. (ECF Nos. 125, 129 at ¶ 72.) With the glass broken, Defendant used the baton to strike Plaintiff in the driver's seat of the Malibu, while commanding him to stop. (ECF Nos. 125, 129 at ¶ 73.) Chief Mehalik, arriving at the scene in his police vehicle with lights and siren activated, was parked "a couple of feet" from the Malibu with his police car facing the Malibu in order to block Plaintiff's exit. (ECF Nos. 125, 129 at ¶¶ 74 & 75.) Seconds after Plaintiff put the Malibu in gear and pushed on the gas, he collided with Chief Mehalik's vehicle. (Plaintiff's Dep. at 73; ECF Nos. 125, 129 at ¶¶ 74, 79.)

---

[7] Plaintiff states that he suffers from gout and arthritis, but testified that he was "running" from Defendant. (Plaintiff's Dep., ECF No. 126-1 at 65.)
[8] The keys were still in the ignition of the Malibu. (ECF Nos. 125, 129 at ¶ 64.)
[9] Plaintiff states he did so because Defendant was at the driver's side door, reaching in, still trying to hit Plaintiff with the baton. Plaintiff's citation to the record at page 68, lines 9-14, does not support his assertion. Plaintiff's citation pertains to the time period after Defendant broke the driver's side window, which had not yet occurred at the time Defendant contends he first saw Plaintiff leaning towards the passenger side of the vehicle.
[10] Plaintiff attempts to create a disputed issue of fact by citing to Defendant's deposition testimony at Page 89, lines 5-8, where Defendant testifies that Plaintiff's hands were on the steering wheel. Defendant's testimony here pertains to the time period after Defendant broke the driver's side window, which had not yet occurred at the time Defendant first approached the driver's side window.

Plaintiff testified that he was not looking where he was going because he was down below the dash. (Plaintiff's Dep., ECF No. 126-1 at 72, 74.) Defendant's arms were still inside the driver's side window when Plaintiff pulled away. (ECF Nos. 125, 129 at ¶ 78.) Plaintiff contends that he feared for his life because his childhood menace, Mehalik was coming onto the scene, and he was also trying to avoid the "brutal attack" by Defendant. (ECF No. 129 at ¶ 78, Plaintiff's Dep., ECF No. 126-1 at 64.)

Plaintiff hit into the left front area of Chief Mehalik's police car as Chief Mehalik was opening the driver's side door and beginning to exit the vehicle. (ECF Nos. 125, 129 at ¶ 80.) Defendant testified that he was unable to see Chief Mehalik after the impact and could not tell whether the Malibu had struck Chief Mehalik's person. Plaintiff disputes this assertion indicating that because Defendant testified he was in the middle of the road, he would have been able to see Chief Mehalik at all times. (ECF Nos. 125, 129 at ¶ 81.) Plaintiff then drove the Malibu through a resident's yard and driveway to get around Chief Mehalik's car. (ECF Nos. 125, 129 at ¶ 82.) Plaintiff testified that after the collision, he was "still traveling with [his] foot on the gas, all the way to the floor . . . ." (Plaintiff's Dep., ECF No. 126-1 at 73.) At this time, Defendant did not have his handgun out, only his baton. (Plaintiff's Dep., ECF No. 126-1 at 74.) Plaintiff was leaning to the right towards the passenger side of the vehicle, below the dash board. (Plaintiff's Dep., ECF No. 126-1 at 72, 76.) Plaintiff drove through other yards as he fled. (Plaintiff's Dep., ECF No. 126-1 at 75.)

Defendant moved away from the collision and ended up in the road. (Defendant's Dep., ECF No. 129-9 at 94.) The parties dispute whether Plaintiff turned the Malibu toward the Defendant. (ECF Nos. 125, 129 at ¶ 86.) Defendant then pulled out his duty weapon and fired five shots at Plaintiff. (ECF Nos. 125, 129 at ¶ 87.) Chief Mehalik fired one shot at the vehicle

7

because he thought that the Malibu was going to strike Defendant. (Mehalik Dep., ECF No. 126-12 at 2.) No bullets hit Plaintiff except for a bullet that grazed his head. (ECF No. 129 at ¶ 96.) Plaintiff admits that he "never claimed [he] was injured in any physical manner." (ECF No. 126-7 at 1.) Chief Mehalik searched for Plaintiff after the incident but did not locate him. (ECF No. 129 at ¶ 95.) Plaintiff does not dispute the fact that he was not driving straight and that he drove through a resident's yard and nearly struck a parked vehicle as he fled at high speed, but contends that his vision was compromised because he was trying to avoid being hit by the officers' gunfire. (ECF Nos. 125, 129 at ¶¶ 92-93.) Plaintiff continued heading down Route 166 towards Brownsville. (ECF No. 129 at ¶ 88.)

Defendant and Chief Mehalik contacted the State Police to handle the incident. Thereafter, Plaintiff turned himself in to the Magisterial District Judge. As a result of the incident, Plaintiff was charged with two counts of aggravated assault, and one count each of simple assault, resisting arrest, and criminal mischief. The October 2, 2009 Order of Judge Steve P. Leskinen of the Court of Common Pleas of Fayette County, Pennsylvania, Criminal Division, ordered that the resisting arrest charge be dismissed because Defendant's attempt to handcuff Plaintiff was not a lawful arrest. The charges of aggravated assault, and criminal mischief, however, were not dismissed by Judge Leskinen because Plaintiff placed Officer Mehalik in danger of serious bodily injury or death, and because the vehicle Plaintiff was driving caused approximately $1,000.00 in damage to the police vehicle. (ECF No. 130-6 at 4.) Judge Leskinen indicated that Plaintiff was not privileged to remove Sigwalt's vehicle from the scene because Sigwalt had been stopped pursuant to a lawful warrant, and the arresting officer had not yet had the opportunity to perform a lawful search of the passenger compartment of the vehicle. (ECF No. 130-6 at 3.) Judge Leskinen also stated that Plaintiff "intentionally drove the car

8

dirtctly into the side of [Mehalik's] patrol vehicle, another action he was not privileged to do . . . ." (ECF No. 130-6 at 3.) After a jury trial, Plaintiff was found guilty of 1 count of aggravated assault, 1 count of simple assault, and 1 count of criminal mischief. (State Court Docket No. CP-26-CR-0000527-2008, ECF No. 126-6.)

Plaintiff, initially proceeding pro se, filed this § 1983 action against a variety of defendants. The sole claim remaining is Plaintiff's Fourth Amendment excessive force claim against Defendant Officer Howard. On March 3, 2014, this Court entered an Order directing the Clerk of Court to request pro bono counsel to represent Plaintiff. (ECF No. 113.) Counsel of record accepted the request and entered her appearance on behalf of Plaintiff on April 10, 2014. Thereafter, this Court granted several extensions for the completion of discovery. Presently before the Court is Defendant Howard's Motion for Summary Judgment on Plaintiff's Fourth Amendment excessive force claim.

## II. LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-

movant's burden of proof. *Id*. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

Here, Defendant contends that he is entitled to judgment as a matter of law because record evidence demonstrates that he did not violate Plaintiff's Fourth Amendment protection from excessive force, and even if he did, he is entitled to qualified immunity. Plaintiff responds that genuine issues of material fact preclude summary judgment because a reasonable jury could conclude that Defendant used excessive force and thereby violated his Fourth Amendment rights.

III. ANALYSIS

**Section 1983**

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, the Plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law, and that such conduct deprived the Plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

**<u>Excessive Force and Qualified Immunity</u>**

State officials, including police officers, performing discretionary acts enjoy "qualified immunity" from money damages in § 1983 causes of action when their conduct does not violate "clearly established" statutory or constitutional rights of which a "reasonable person" would have known at the time the incident occurred. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "avoid[s] excessive disruption of government and permit[s] the resolution of many insubstantial claims on summary judgment." *Id.*

In *Saucier v. Katz*, 533 U.S. 194 (2001), the United States Supreme Court discussed the two-step qualified immunity inquiry. The Court directed that, in deciding whether a defendant is protected by qualified immunity, a court first must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct

violated a constitutional right." *Id*. at 201. If the facts do not establish the violation of a constitutional right, no further inquiry concerning qualified immunity is necessary. *Id*. If the facts, including the disputed facts taken in the light most favorable to the nonmoving party do show a violation of his rights, then the court must proceed to determine whether the right was "clearly established," that is, whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. *Id*. at 201-02. In *Pearson v. Callahan*, 555 U.S. 223 (2009), the United States Supreme Court concluded that while the two-step sequence identified in *Saucier* "is often appropriate, it should no longer be regarded as mandatory." *Id*. at 236. As recently indicated in a precedential case by the United States Court of Appeals for the Third Circuit, "[t]his two-step process has more particularized requirements in an excessive force case . . . ." *Santini v. Fuentes*, No. 14-2938, 2015 WL 4620235, at *5 (3d Cir. Aug. 4, 2015). In *Santini*, the court of appeals succinctly set forth these more particularized requirements as follows:

> In an excessive force case, we determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test. To determine objective reasonableness, we must balance the "nature and quality of the intrusions on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."
> While this inquiry is highly individualized and fact specific, the Supreme Court has provided three factors to guide us through it: (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene. *Graham* [*v. Connor*]*,* 490 U.S. [386,] [ ] 396; *see also Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir 1997) (providing additional factors including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officer must contend at one time"). We evaluate objective reasonableness from the perspective of the officer at the time of the

12

> incident and not with the benefit of hindsight. In sum, we employ a "totality of circumstances" approach for evaluating objective reasonableness.
> During the second step of the *Saucier* inquiry, we inquire whether—even though an officer violated an individual's constitutional right—immunity should still protect that officer from liability. To answer that question, we must determine whether the right violated by the officer was clearly established at the time of the violation. To make that determination, we engage in another reasonableness inquiry: "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [T]his inquiry is objective and fact specific. [T]he purpose of the step two inquiry is to acknowledge the reality that "reasonable mistakes can be made as to the legal constraints on particular police conduct."

*Santini*, 2015 WL 4620235, at *5 (citations omitted).

Here, the Court exercises extreme caution in construing all facts and inferences in favor of the Plaintiff, the nonmoving party.[11] *See Santini*, 2015 WL 4620235, at *7.

In employing the *Graham* totality of the circumstances test, the Court examines the entire sequence of events as they unfolded, and without benefit of hindsight. *See Santini*, 2015 WL 4620235, at*5 (citing *Maryland v. Garrison*, 480 U.S. 79, 85 (1987)). First, upon lawfully securing Sigwalt in the back of his police cruiser after confirming that her outstanding warrant was still in effect, Defendant observed Plaintiff repeatedly turning his head, moving about, and making reaching movements. A reasonable police officer under these circumstances would have been concerned that Plaintiff may have been reaching for a weapon. Defendant approached the passenger side of the Malibu, and at this time in March 2008, a reasonable police officer would have believed that he had the right to search the passenger compartment of the vehicle pursuant to the lawful arrest of Sigwalt, even after she was secured in the back of the police cruiser.

---

[11] In Plaintiff's Response to Defendant's Concise Statement of Material Facts, Plaintiff cites to the record in an attempt to raise disputed issues of material fact. Repeatedly, the Court's examination of these citations reveals that the record does not support the facts for which Plaintiff attempts to raise a dispute. Disputed issues of fact must be supported by record evidence, and not merely assertions of counsel.

*Thornton v. United States*, 541 U.S. 615, 623-24 (2004). *See also Davis v. United States*, 131 S. Ct. 2419, 2424-25 (2011) (discussing the bright-line rule authorizing automobile searches incident to arrest of recent occupants until the 2009 Supreme Court case of *Arizona v. Gant*, 556 U.S. 332 (2009)). Upon approaching the passenger side of the Malibu, Defendant further observed that Plaintiff's head disappeared from view for a second or two as he approached, and at that time could not see Plaintiff's hands. Again, in securing the vehicle, a reasonable police officer would be concerned that the passenger had a weapon. When Defendant reached the passenger side of the vehicle, he could see that Plaintiff's hands were down below the seat, again alerting a reasonable officer that a weapon may be under the seat.

Upon taking Plaintiff to the back of the Malibu, running his name through county dispatch, and learning from Chief Mehalik that he should "use some caution with" Plaintiff, and that Chief Mehalik was "on [his] way down there[,]" Defendant made the decision to hand cuff Plaintiff for his own safety. Plaintiff admits that upon hearing Chief Mehalik's voice over the radio and his intention to arrive at the scene, he became terrified. Plaintiff repeatedly refused to go into handcuffs and admitted that he started backing toward the passenger side of the car. A reasonable officer in Defendant's position could have believed that Plaintiff was again going for the passenger door to secure a weapon located inside the Malibu, and this concern would have been heightened by Chief Mehalik's warning to proceed with caution when dealing with Plaintiff, an individual otherwise unknown to Defendant.

After attempting to protect himself by placing Plaintiff into hand cuffs, and after Plaintiff's repeated refusals to comply, Defendant tasered Plaintiff with no perceptible effect. Plaintiff attempts to create a disputed issue of material fact as to whether the taser shocked him. In his Complaint and Amended Complaint, Plaintiff states unequivocally that the taser failed to

14

work both times. (Complaint, ECF No. 3 at 4 (Defendant "tased your Plaintiff twice with a taser gun which failed to work."); Amended Complaint, ECF No. 65 at 5 (Defendant "tried to taser me but was unable to after two trys [sic]."). "A fact asserted in a pleading, which is both unequivocal and which would normally require evidentiary proof, constitutes a judicial admission." *Judon v. Travelerers Property Cas. Co.,* 773 F.3d 495, 502 n.6 (3d Cir. 2014) (citing *Parilla v. IAP Worldwide Servs., VI, Inc.,* 368 F.3d 269, 275 (3d Cir. 2004) (facts "expressly conceded" in a complaint constitute judicial admissions).). In his deposition testimony, Plaintiff testified that he "felt a shock" from the taser and that his knees buckled. (Thompson Dep., ECF No. 126-1 at 61.) Plaintiff is estopped from contradicting his own admissions in his Complaint and Amended Complaint, absent a plausible explanation for the contradiction, which appears at no point in the record. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 360-61 (3d Cir. 1996) (judicial estoppel is an equitable, discretionary doctrine invoked by a court to preserve the integrity of the judicial system by preventing parties from playing "fast and loose" in assuming inconsistent positions); *see generally Ortlieb v. Hudson Bank*, 312 F. Supp.2d 705, 710 (E.D. Pa. 2004) (discussing the history of judicial estoppel and that absent a sufficient explanation, a party should be prohibited from taking irreconcilably inconsistent positions). Hence, Defendant's use of the taser, which had no effect on Plaintiff, cannot constitute excessive force.[12]

---

[12] Even if the taser did work, police officers may use tasers when dealing with persons who present a safety issue and who fail to comply with police directives where warning is given prior to deploying the taser. *See Brown v. Cwynar*, 484 Fed. App'x 676, 680 (3d Cir. 2012) (citing *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)). Here, Defendant had seen Plaintiff making reaching movements under the front seat and had not yet searched the vehicle incident to arrest; he received warning from Chief Mehalik to proceed with caution; Plaintiff had repeatedly refused to comply with Defendant's directive to go into cuffs; and Plaintiff admitted that he suffered no physical injury. Hence, no reasonable jury could return a verdict in favor of Plaintiff on the issue of excessive force concerning the taser where the amount of force in using the taser was proportional to the threat perceived by Defendant. *See generally La v. Hayducka,* 269 F. Supp.2d 566, 577 (D.N.J. 2003) (section 1983 plaintiff did not have constitutional right to resist police officers whether or not he perceived arrest to be wrongful).

Next, the parties agree that Defendant shocked himself with the taser. According to Plaintiff, Defendant became angry, used racial epithets and threatened to kill Plaintiff. "The rule is that if the physical force used is not itself excessive, i.e., is reasonable, then, merely adding verbal threats or racial epithets cannot transform an otherwise non excessive use of force into an unconstitutional use of excessive force." *Hudson v. Goob*, No. 2:07cv1115, 2009 WL 789924, at *12 (W.D. Pa. March 24, 2009) (citing *Johnson v. City of Ecorse,* 137 F. Supp.2d 886, 892 (E.D. Mich. 2001) ("Policemen's use of slurs and racial epithets is not a search or seizure, and thus cannot sink to the level of violating the Fourth Amendment's prohibition of excessive force."); *Williams v. Belknap,* 154 F. Supp.2d 1069, 1072 n.1 (E.D. Mich. 2001) ("A policeman's taunting, however, cannot violate the Fourth Amendment."); *Thompson v. City of Galveston,* 979 F. Supp.504, 509 (S.D. Tex. 1997) ("claims of excessive force are compensable only to the extent that an injury is caused directly by the use of excessive force, not, as alleged here, as having been caused by an alleged use of force in addition to allegations of intimidation and verbal threats.")) (other citation omitted). Hence, Defendant's alleged use of racial slurs and verbal threats will not transform Defendant's reasonable use of force into a Fourth Amendment violation.

After Defendant shot himself with the taser, the pursuit around the Malibu began. Although Defendant was commanding Plaintiff to stop, Plaintiff continued around the Malibu, and Defendant began striking Plaintiff with the baton when Plaintiff failed to comply. At this point, Plaintiff was able to get into the driver's seat of the Malibu, lock the door, and start the engine. In order to stop Plaintiff from fleeing the scene with the Malibu, which he had not yet had the opportunity to search, Defendant used his baton to break the glass, still commanding Plaintiff to stop. A reasonable officer would be justified in taking these actions to prevent

Plaintiff from fleeing the scene, believing at the time in 2008 pursuant to *Thornton,* 541 U.S. at 623-24, that he had a legal right to search the passenger compartment of the Malibu incident to Sigwalt's lawful arrest. Moreover, by this time, Plaintiff's behavior had become so evasive and uncooperative, that a reasonable officer could have concluded that evidence of a crime was contained inside the Malibu.

Finally, the record evidence is clear that Defendant's arms were still inside the driver's side window when Plaintiff stepped on the gas to flee the scene, that Plaintiff was leaning down towards the passenger seat as he fled, could not see, and that he hit Chief Mehalik's cruiser which had arrived on the scene. Plaintiff admitted that he continued to lean towards the passenger side of the vehicle to avoid the oncoming bullets. He admits that he drove through yards as he fled.

Clearly, a reasonable officer in the context of these rapidly unfolding events would have concluded that Plaintiff posed an imminent threat to the safety of Defendant, Chief Mehalik, and any innocent bystanders, motorists and nearby residents. *See Scott v. Harris*, 550 U.S. 372, 381-383 (2007) (officer entitled to summary judgment when using deadly force to stop reckless, high speed flight that could have endangered the officer, other officers at the scene, and any innocent pedestrians and civilian motorists); *see also Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (a car may be used as a deadly weapon) (citing *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (car can be deadly weapon and an officer's decision to stop car from possibly injuring others was reasonable)).

Similarly, a reasonable officer would have been concerned for the safety of Chief Mehalik in light of the uncertainty as to whether there was a weapon in the Malibu to which Plaintiff may have had access after he entered the driver's side of the Malibu and locked the

17

door. Likewise, Defendant testified that he could not see Chief Mehalik after the impact and could not tell whether he had been hit. A reasonable officer would have pursued Plaintiff in light of what appeared to be the use of deadly force as to Chief Mehalik.

When balancing the force used by Defendant against the safety of the officers at the scene and the possible harm to those in the immediate vicinity, Defendant's use of force was objectively reasonable. "Where a police officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Hill v. Nigro*, 266 Fed. App'x 219, 221 (3d Cir. 2008) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

In the alternative, even if a reasonable jury could conclude from this record that any of the force used was excessive under the particular facts of this case, Defendant is entitled to qualified immunity. As noted in *Santini*, the second step of the qualified immunity analysis addresses "'whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should . . . be protected against suit[.]'" *Santini*, 2015 WL 4620235, at *6 (quoting *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007)). As discussed above, as of March 2008, Defendant would have reasonably believed that he had a legal right to search the passenger compartment of the Malibu, even after Sigwalt was secured in the police cruiser. Plaintiff's evasive actions, reaching motions, hands visibly beneath the seat, and eventual flight, would have led a reasonable officer to believe that evidence of crime or other contraband was in the Malibu. Moreover, Defendant had been warned by Chief Mehalik to exercise caution in dealing with Plaintiff, an individual he did not otherwise know. Although Judge Leskinen indicated that Defendant's attempt to handcuff Plaintiff was not a

lawful arrest, it would not have been clear to a reasonable officer that his conduct was unlawful in light of the safety concerns Defendant confronted.

Nor would it have been clear to a reasonable officer that his conduct was unlawful when Defendant used a taser, and then a baton, in response to Plaintiff's repeated refusals to obey Defendant's commands, especially as it became clear that Plaintiff intended to flee the scene.

Finally, it would not have been clear to a reasonable officer that his conduct was unlawful when he used deadly force to protect Officer Mehalik, innocent pedestrians, and nearby residents when Plaintiff drove the Malibu into the side of Chief Mehalik's patrol vehicle just as he was exiting; drove the Malibu through a resident's yard and driveway to get around Mehalik's car; and drove through other yards as Plaintiff fled the scene. All the while, Plaintiff admittedly had his "foot on the gas, all the way to the floor," and was not looking where he was going. As stated by the United States Supreme Court in *Scott*, "we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. . . . The Constitution assuredly does not impose [an] invitation to impunity-earned-by-recklessness." 550 U.S. at 385-86 (emphasis in original).[13]

Hence, qualified immunity will protect Defendant from suit.

---

[13] Justice Scalia also considered the relative fault of the individuals at or near the scene as follows:

> We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was [the fleeing suspect], after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the police officer] confronted. . . . [T]hose who might have been harmed had [the police officer] not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for [the police officer] to take the action that he did.

*Scott*, 550 U.S. at 384.

19

IV. CONCLUSION

For the reasons discussed above, Defendant Howard's Motion for Summary Judgment will be granted.

An appropriate Order will follow.

BY THE COURT

/s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
UNITED STATES MAGISTRATE JUDGE

Dated: August 26, 2015

cc: All counsel of record
    Via electronic filing